# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ANTHONY B. STELTER,**

                Plaintiff,

    v.                                    **Case No. 14-cv-904-pp**

**ANTHONY MELI,**
**RANDY VANDE SLUNT,**
**BELINDA SCHRUBBE,**
**PAULA TIRUVEECULA,[1]**
**JAY CERNY,[2] and**
**CORY SABISH,**

                Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (DKT. NO. 36) AND DISMISSING CASE

---

The plaintiff is a Wisconsin state prisoner, representing himself. On September 9, 2014, the court entered an order allowing the plaintiff to proceed on two claims under 42 U.S.C. §1983 that the defendants violated his Eighth Amendment rights with regard to his work conditions with Badger State Industries (BSI) at Waupun Correctional Institution (Waupun). Dkt. No. 12 at 3. On March 30, 2015, the defendants filed a motion for summary judgment, Dkt. No. 36, which is fully briefed. For the reasons set forth below, the court will grant the defendants' motion for summary judgment.

---

[1] This defendant's declaration reveals that the plaintiff misspelled this defendant's name. The court will use the correct spelling, Paula Tiruveedula. Dkt. No. 43.

[2] This defendant's declaration reveals that the plaintiff misspelled this defendant's name. The court will use the correct spelling, Jay Cerney. Dkt. No. 39.

1

## I.   FACTS[3]

### A.   Parties

The plaintiff is a state prisoner who was housed at Waupun Correctional Institution (Waupun) at all times relevant to this lawsuit. Dkt. No. 38, ¶ 16. The plaintiff worked for Badger State Industries (BSI) at Waupun. Dkt. No. 38 at ¶ 23. He worked in the Metal Furniture Body Shop from June 17, 2013, until May of 2014. Id. Since May 2014, the plaintiff has worked as a clerk in the Metal Furniture Shop. Id.

Most of the defendants work at Waupun. Anthony Meli is the security director, Cory Sabish is a lieutenant, Jay Cerney is a sergeant; Belinda Schrubbe was the Health Services Unit (HSU) manager; and Randy Vande Slunt is the Bureau of Correctional Enterprises-Badger State Industries Supervisor at Waupun. Id. at ¶¶ 1, 3, 5, 7, 13. Defendant Paula Tiruveedula is the Bureau of Correctional Enterprises-Badger State Industries Corrections Administrative Supervisor. Id. at ¶¶ 10-12.

### B.   Badger State Industries

"BSI is a prison industry program operated by the State of Wisconsin." Id. at ¶ 17. It employs inmates at various correctional institutions to make

---

[3] The court takes the facts from the "Defendants Proposed Findings of Fact," Dkt. No. 38, and the declarations (of himself and others) that the plaintiff submitted in opposition to the defendants' motion for summary judgment. Dkt. Nos. 47-48. The plaintiff's responses to the defendants' proposed findings of fact were not sworn, so the court will consider them as arguments. The plaintiff does cite to some admissible evidence in his arguments. Dkt. No. 46. The court also may construe the plaintiff's sworn complaint as an affidavit at the summary judgment stage. Dkt. No. 1; Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996). The facts presented are undisputed, unless otherwise noted.

products and provide services for state and federal agencies. Id. BSI includes "a wood furniture shop, metal furniture shop, print shops, metal stamping shop (license plates), sign shop, textiles shops, upholstery shop, computer and wheelchair recycling shops, and laundry operations." Id. at ¶ 18. "The prison industries program provides inmates with meaningful employment opportunities and, in turn, assists inmates with reintegration into their communities." Id. at ¶ 19. "The BSI employment opportunities are extremely desirable for inmates within the prison setting;" they pay more than any other prison jobs. Id. at ¶ 20. "Because inmates hired for these positions often work with dangerous equipment" and hazardous material, inmates seeking employment with BSI "must be responsible and have a record of good behavior." Id. at ¶ 21. Inmates apply for their desired position and go through an interview process, but the Security Director or his designee makes the final hiring decision. Id.

Inmates who work for BSI in the Metal Furniture Building build products such as metal fencing, office furniture, and lockers. Id. at ¶ 22. As a Body Shop worker in the Metal Furniture Building, the plaintiff prepared metal for sanding and painting. Id. at ¶ 24. In his position as a clerk, he "handled clerical tasks such as entering work orders into a computer system and processing time cards." Id. at ¶ 25.

"All inmates employed with BSI at WCI are provided with a copy of the Prison Industries Inmate Workers Handbook." Id. at ¶ 26. "The handbook states that each industry location shall develop policies and procedures

3

covering things such as personal business, breaks, cleanup, tool control, health and safety, and other policies and procedures related to the unique operation of that particular industry." Id. at ¶ 27. "The Work Rules and Discipline Policy is outlined in the handbook." Id. at ¶ 28. "It states that prison industries work rules are defined" in Wis. Admin. Code § DOC 313.08, "and that each individual work location may develop standards to clarify the applicability of certain work rules, and/or establish additional policies and procedures in accordance with the needs of a particular work environment." Id.

On June 17, 2013, when the plaintiff began working at BSI, he signed the Work Rules and Discipline Policy for Prison Industries Inmate Workers. Id. at ¶ 29. "The Work Rules for Inmate Workers section establishes that inmates are in breach of the rules if they violate any health and safety procedure or instruction, including but not limited to shop or machine procedures." Id. at ¶ 30. The plaintiff objects to any rule not written down and given to the inmate workers and submits that most workers in his area (MF-2) were never told of safety rules and warnings. Dkt. No. 47 at ¶ 4, 5, 6, 11; Dkt No. 47-2 at ¶ 2, 3; Dkt. No. 47-3 at ¶ 9; Dkt. No. 47-4 at ¶ 2-4.

C.     Plaintiff's Claims

The court allowed the plaintiff to proceed on a claim that defendants Schrubbe, Cerney, Sabish, and Meli failed to provide or require proper safety equipment when the plaintiff was working with carcinogens. Dkt. No. 12 at 3. The plaintiff claims that he was exposed to a "known carcinogen" while working in the Body Shop, and was "never told about the hazards from the sanding

4

pads or paper, grinding and cutting discs." Dkt. No. 22 at 3, ¶¶ 12 and 14. Specifically, the plaintiff says that he was exposed to "Microcrystalline Silica." Id. at ¶ 14. He claims that breathing metal dust and Microcrystalline Silica caused him to "cough and sneeze out black matter, causing chest pains, dizziness and nose bleeds." Id. at 3-4, ¶ 16.

The court also allowed the plaintiff to proceed on a claim that defendants Vande Slunt and Tiruveedula failed to warn the plaintiff or provide safety equipment for working with a blade. Dkt. No. 12 at 3. According to the plaintiff, he came into contact with a blade coolant product on March 4, 2014, and developed "a large rash and hives" on the back of his hand that "lasted over 10 days." Dkt. No. 22 at 4, ¶¶ 17 and 19.

D.    The Body Shop

In his position as a Body Shop worker at Waupun, the plaintiff worked in the Metal Furniture Building and prepped metal for sanding and painting. Dkt. No. 38 at ¶ 24. He was required to use sanding products and operate equipment to cut and grind metal. Id. The plaintiff contends that the sanding products contained microcrystalline silica (MCS) and that he was never told or warned to wear a mask. Dkt. No. 22 at ¶¶ 15-16. MCS is commonly referred to as sandpaper, and the proper precaution when working with sandpaper and/or sanding disks is to wear a safety mask. Dkt. No. 38 at ¶ 42.

The defendants submit that inmates who work in the Body Shop have an abundance of safety equipment available to them. Id. at ¶ 31. The defendants say workers are provided with protective gear "such as waterproof

5

gloves, leather gloves, rubber gloves, rubber-dipped cloth gloves, body coverings, disposable coveralls, caps, masks, and eye protection." Id. Inmates get five work uniforms per week, which stay in their lockers; they put on the uniforms when they arrive for work, and when they leave, the dirty uniforms go to the laundry. Large sinks with plenty of soap are available in the Body Shop and basement, so that inmates may wash up during breaks, lunch or at other times during their shifts. Id. at ¶¶38, 48. The plaintiff submitted declarations suggesting that inmates are not provided with waterproof gloves, rubber gloves, adequate body coverings, or adequate masks. Dkt. No. 48 at ¶ 16; Dkt. No. 47 at ¶ 9; Dkt. No. 47-3 at ¶ 2, 5-6.

The Body Shop has a ventilation system. Dkt. No. 38 at ¶ 32. "Multiple overhead exhaust fans and vents provide airflow and suck any residual dust out of the air." Id. The Body Shop also has "multiple portable vents which allow inmates to place a vent in the best position for proper ventilation in their immediate work area." Id. Vent filters are regularly changed. Id.

The plaintiff says the ventilation is inadequate; that he was told that the smoke eaters were only for welding fumes and wouldn't work for sanding tall items; and that the overhead vents were located to the right of the Body Shop outside the plastic curtain, so they do not aid in exhaust in the Body Shop. Dkt. No. 48 at ¶ 8. The plaintiff also says that the photos of the Body Shop which the defendants submitted (Dkt. No. 44-3) show no posted warning signs telling people to wear masks, and that the filters "are not N-95 rated and come up to MF-2 from MF-1 paint room used." Id.; Dkt. No. 47-3 at ¶ 8. He argues

6

that this allows MCS to be blown onto inmates working in the Body Shop. Dkt. No. 48 at ¶ 8.

When they are hired, inmates receive an "orientation from the industry supervisor/specialist." Dkt. No. 38 at at ¶ 33. In the Waupun Metal Furniture Shop, Body Shop Technicians (Techs) who are assigned to production posts perform inmate training and "act as the immediate supervisors in each area." Id. at ¶ 34. Techs provide inmates with individual, one-on-one verbal training. Id. The Techs also show inmates the protective gear and safety equipment available and teach the inmates proper use of tools and machinery, safety precautions, and expectations. Id. at ¶ 35. "Equipment manuals for the machines are also made available to the inmates to read through if they want to study further." Id. at ¶ 34.

Vande Slunt contends that he is not a Body Shop Technician and did not train the plaintiff on how to perform his job in the Body Shop or train him on the proper safety precautions. Id. at ¶ 36. The plaintiff asserts that Vande Slunt is responsible either for training the Techs or for providing them with information on health and safety. Dkt. No. 48 at ¶ 9. The plaintiff never complained to Vande Slunt about his concerns regarding lack of safety equipment. Dkt. No. 38 at ¶ 56. The plaintiff asserts that he and others all asked about safety equipment, but none of this evidence disputes Vande Slunt's assertion because it does not say that they complained to Vande Slunt (versus someone else).

The defendants submit that "various signs are posted throughout the Body Shop which prohibit inmates from going past certain points if they are not wearing proper safety attire, such as steel-toe shoes and safety goggles." Dkt. No. 38 at ¶ 37. As indicated above, the plaintiff says that the defendants' photo of the Body Shop shows no warning signs. Dkt. No. 48 at ¶ 8.

The defendants state that inmates are advised to wear masks when working in the Body Shop, "especially when working with machinery that creates dust." Id. at ¶ 39. "Because masks are often stolen, inmate workers are given one mask to keep in their locker." Id. "When that mask gets old or worn, they may turn it in for a new one." Id. According to the plaintiff, he was never provided with a "proper CDC Approved face mask" or told to wear one. Dkt. No. 22 at ¶ 13.

There is also a dispute about whether "range books" are available that contain Material Data Safety Sheets (MSDS) about every product or chemical used in the Body Shop. Dkt. No. 38 at ¶ 40; Dkt. No. 47-1 at ¶ 4; Dkt. No. 47-3 at ¶ 7.

Cerney is the assigned sergeant in the Metal Furniture Building. Dkt. No. 38 at ¶ 57. The defendants state that he is "not responsible for training inmates on how to perform their job, supervising their work, or making sure they are following proper safety procedures." Id. "If Cerney notices that an inmate is not following safety procedure, he may tell the inmate to stop, but he more likely would report the concern to the inmate's technician supervisor." Id.

8

The plaintiff asked Sergeant Knapp if BSI sergeants were responsible for inmate health and safety while they were working at BSI. Dkt. No. 48 at ¶ 10. Knapp replied that "protecting inmates and staff was the number one job of the sergeant." Id. On another day, the plaintiff asked Knapp if "as a sergeant you saw an inmate worker working with a material in a way that could harm the inmate would you have to stop it?" Id. Knapp replied, "Because its security related I would have to." Id.

"Cerney and the correctional officers who work in the Metal Furniture Building are responsible for distributing and keeping track of sharps and power tools that could be used as weapons." Dkt. No. 38 at ¶ 58. "They are also responsible for other supplies, including protective gear." Id. "Security distributes these items to prevent theft. Protective gear is distributed upon request." Id.

The plaintiff never complained to Cerney about his concerns regarding lack of proper safety equipment. Id. at ¶ 92. If he had, Cerney would have directed the plaintiff to talk to the Tech supervising him or "informed him about the safety equipment that is available." Id. The plaintiff says he expressed his concerns to his Tech (Russ) and to Lowney. Dkt. No. 48:2 at ¶¶ 5, 7.

E.    Blade Coolant

"The basement of the Body Shop is where all the raw material is prepped." Dkt. No. 38 at ¶ 43. "Materials such as sheet metal, pipes, tube steel, and angle iron are all purchased by the bundle and can be delivered in 20'

9

lengths." Id. "The equipment in the basement cuts or shears the product to the size that is needed for the making of metal furniture, i.e., desks, file cabinets, bookcases, etc." Id. "The parts are then moved to the 2nd floor for actual production of the furniture." Id.

On March 4, 2014, the plaintiff worked in the basement on a machine that was used to bend and cut metal. Id. at ¶ 44. The machine generates heat in the process, so it is necessary to "temper the heat with a mixture of blade coolant and water in order to keep [the machine] from overheating." Id. The defendants say that "some minimal coolant may spray from the machine during operation," but that it is "not enough that the operator would become soaked in it." Id. The plaintiff disputes this, and submits evidence that clothing gets soaked while working on the saw. Dkt. No. 47-3 at ¶ 3-6. The plaintiff states that on March 4, 2014, after working with soaked gloves for about six hours, he discovered a rash, and showed it to CO Lowney. Dkt. No. 22 at ¶¶ 17, 18, 19.

"Klear Kut is the semi-synthetic cutting coolant" used with the machine the plaintiff used on March 4, 2014. Dkt. No. 38 at ¶ 45. "The MSDS sheets for the coolant reveal that 'prolonged contact may cause drying of skin with possible irritation and/or dermatitis.'" Id. "If the coolant comes into contact with skin, the skin should be flushed with water, and then washed with soap and water." Id. "Medical attention should be sought if irritation persists." Id.

On Saturday, March 8, 2014, the plaintiff submitted a Health Service Request (HSR). Id. at ¶ 49. In it, the plaintiff said that he had a rash and/or

Case 2:14-cv-00904-PP   Filed 03/30/16   Page 10 of 37   Document 60

hives on the back of his left hand after working with blade coolant on Tuesday (March 4). Id. The plaintiff was seen in the HSU on March 12, 2014. Id. at ¶ 50. He told the nurse that he had been working with blade coolant and, "at the end of the day, had a rash on his left hand and right arm." Id. Upon examination, "the nurse found a faint area of redness 6 cm X 5 cm on the back of [the plaintiff's] left hand, near the thumb, with some coarseness of skin; slightly raised and rough to the touch." Id. at ¶ 51. The plaintiff also had two spots on his inner lower forearm that were faintly red and raised. Id. "The nurse noted that [the plaintiff] had tried hydrocortisone, antibacterial lotion, and lanolin lotion twice a day. Id. at ¶ 52. The plaintiff's chart was referred to the Nurse Practitioner for review, and the Nurse Practitioner wrote a prescription for Clobetosol cream the next day. Id. at ¶¶ 52-53. The plaintiff was advised to apply to the affected area twice per day as needed for one month, and then stop using it. Id. at ¶ 53.

According to the defendants, the plaintiff had the opportunity to wear long rubber gloves while operating this machine; the gloves are kept with the machine. Id. at ¶ 47. They assert that if the plaintiff had worn the gloves while operating the machine, the plaintiff's hand, wrist, and forearm would have been covered. Id. The plaintiff disputes that there were long rubber gloves available to him while operating the machine; he says they were placed near the machine just for pictures. Dkt. No. 48 at ¶ 3; Dkt. No. 47-3 at ¶ 2, 6; Dkt. No. 47-4 at ¶¶ 5-8.

The sinks in the Body Shop and basement are extra-large, deep, and "with ample soap supply." Dkt. No. 38 at ¶ 48. As indicated above, inmates are allowed to wash up in the sinks during scheduled breaks, lunch, and at any other time throughout their shift. Id. According to the plaintiff, those sinks have lead in them and warning memos were posted briefly and then removed within a few days. Dkt. No. 48 at ¶¶ 3-6.

F.    Showers

Inmates incarcerated at Waupun are permitted to shower four days per week (unless they are housed in segregation). Dkt. No. 38 at ¶ 59. "A shower crew consisting of second shift officers generally handles shower detail." Id. at ¶ 60. At Waupun, "there are four cell halls with one bath house in between." Id. at ¶ 61. "Each cell hall consists of four ranges which house up to 70 inmates each." Id. "The South West Cell Hall, where [the plaintiff] is housed, can house up to 57 inmates on each range." Id. "When inmates are showered, each range is called one at a time, and inmates have the opportunity to shower for up to 20 minutes." Id. at ¶ 62. Once they are finished, the process continues until all the ranges have showered. Id. This process usually takes between one and a half and two hours to complete. Id.

"When inmates arrive at the shower, they are provided with a towel and soap, together with clean underwear, t-shirt, and socks." Id. at ¶ 63. Even if inmates don't shower, they are given the opportunity to exchange their dirty clothes for a clean set. Id.

12

"Inmates may be afforded additional shower opportunities if they attend certain recreation periods." Id. at ¶ 64. "The recreation buildings are equipped with showers and inmates are allowed to shower towards the end of certain recreation periods." Id.

"All of the inmates who work at BSI are housed in the Southwest Cell Hall." Id. at ¶ 65. "BSI workers are housed in the same cell for movement purposes; they are escorted as a group to the Metal Furniture Building for work, and they travel back together when work is done for the day." Id.

"When Cerney first began his post as the sergeant at the BSI Metal Furniture Building, he discovered that all of the inmates in the building were being allowed showers at the end of their shift regardless of need." Id. at ¶ 66. At the time, the work hours of the BSI Metal Furniture Building were 7:00 a.m. to 3:00 p.m. Id. "The practice was to release inmates from their job at 2:30, so they had time to travel back to their cell hall or do other activities like go to the library." Id. The nearby recreation building was empty from 2:00 p.m. to 2:30 p.m. Id. "BSI inmate workers were being given passes to shower in the recreation building during this time." Id.

"Cerney noticed that many BSI inmate workers were getting shower passes unnecessarily and taking showers every day, even when they worked in clerical positions." Id. at ¶ 67. "Cerney felt that the practice of giving all BSI employees a pass to shower at 2:00 p.m. was unfair because it gave BSI workers a benefit (more frequent showers) that was not available to other inmates." Id. at ¶ 68. Cerney reported his concern up the chain of command.

13

Id. "When Cerney reported his concern about the showering practices at BSI, he initially asked if the practice of giving inmates passes to go shower could be ended entirely." Id. at ¶ 69. There is a single shower in the BSI Metal Furniture Building, and Cerney asked if the inmates who work with irritants at BSI could just use that shower at the end of their shift and other BSI workers could shower in the cell hall according to the normal procedure. Id.

The deputy warden indicated that "the shower in the Metal Furniture Building could not be used by inmates because it is located in a blind spot and staff would not be able to properly monitor inmate activity in the shower area." Id. at ¶ 70.

On August 8, 2011, Captain O'Donovan issued a memo to all BSI workers at Waupun, stating that only inmates in certain jobs would be permitted to shower in the recreation hall at the end of their shifts. Id. at ¶ 71. The memo described the allowed showers as a "courtesy only," because it is not necessary for any BSI workers to take a shower at the end of their shift. Id. at ¶ 72. The identified inmate jobs were allowed to continue to take showers because they work with irritants, but a shower is not required because the materials they work with do not qualify as hazardous. Id.

"Around March 2014, the deputy warden changed the hours of operation for the BSI Metal Furniture Building from 7:00 am--3:00 pm, to 7:30 am--3:30 pm." Id. at ¶ 73. The changes in hours resulted from a broader change to a uniform starting time of 7:30 a.m. for first shift security staff. Id. "Around this same time, the practice of releasing inmates from their job a half an hour

before their shift ended was changed so they would only be released only 15 minutes before their shift ended, so at 3:15 pm." Id. All shower passes for BSI workers to go to the recreation building were canceled as a result of this change. Id. at ¶ 74. "The only time that the recreation building was not being used by other inmates was between 2:00 and 2:30 pm." Id. "If BSI workers were sent to shower during this time it would cause their shift to end an hour and a half before the actual end time since they would not resume work after the shower." Id.

"BSI workers could not be sent to the recreation building while it was being used by other inmates for security reasons." Id. at ¶ 75. There are many special placement needs (SPN) in place at Waupun "that require the institution to maintain physical separation between certain inmates." Id. "SPNs can be put in place for a variety of reasons including gang issues, inmates testifying against each other, and prior victimization." Id. Waupun "maintains physical separation between inmates in the institution by keeping total separation between inmates in the north and south cell halls." Id. Recreation periods for the north and south cell halls change from week to week "to insure that, over time, inmates on both sides get the same number of recreation periods." Id. Sending BSI employees "to the recreation building while it was in use would expose the BSI workers from the south cell halls to inmates from the north cell hall." Id. "There is no system in place that would allow security staff in the metal furniture building or in the recreation building to monitor whether sending BSI workers to recreation would violate an SPN and place an inmate in

danger." Id. "As a result, staff cannot allow BSI inmates to use the shower during other inmates' recreation period." Id.

"When the shower passes were canceled, BSI workers were advised that they could wash up in the sinks available in their work areas and shower with their cell halls." Id. at ¶ 76. "Inmates also have the opportunity to wash up using the sinks in their cells." Id. at ¶ 77. Shortly after the passes were canceled, Vande Slunt asked for permission to allow inmates with certain jobs to use the single shower stall in the Metal Furniture Building to rinse off after work. Id. at ¶ 78. "Vande Slunt had to seek permission to make this change based on the deputy warden's prior direction that the shower was not to be used." Id.

G.    Offender Complaint and Interview/Information Request Form

On March 18, 2014, the plaintiff "filed Offender Complaint Number WCI-2014-6197, complaining that he was unable to take a shower after working at BSI." Dkt. No. 38 at 79. When an inmate has a concern or complaint, they are encouraged to attempt to resolve the problem informally through the industry supervisor/specialist. Id. at ¶ 55. The plaintiff says that he tried to resolve the issues with Vande Slunt at approximately noon on March 25, 2014. Dkt. No. 43-1, Ex. 1000 at 2.

On April 17, 2014, the plaintiff submitted an additional document in support of this complaint, which he called an "ICE Addendum." Dkt. No. 38 at ¶ 80. In this document, the plaintiff indicates that he found out from the Metal Finishing book provided in the Body Shop that the material used in sanding

16

pads and paper to grind metal is a carcinogen. Id. He asked: "How is 'Security' protecting me by refusing me the ability to shower, after working with carcinogens, to wash off these cancer causing partic[le]s?" Id.

Tonia Moon, Waupun's Institution Complaint Examiner (ICE), investigated the plaintiff's claim, and on May 20, 2014, recommended that it be dismissed. Id. at ¶ 81. She noted that the plaintiff is allowed to wash up in the sink after he is done grinding metal. Id. She noted that Health Services Unit manager Schrubbe said that the plaintiff did not need to shower after grinding metal and could just wash up, and that the plaintiff could have avoided the rash if he had washed up after working with the blade coolant. Id. Finally, Moon said she was going to send a copy of her decision to Vande Slunt "to make sure that inmate Stelter's current job is appropriate since he is breaking out from doing it and the shower process is not going to change." Id.

As Corrections Administrative Supervisor for BSI, Tiruveedula "acts as the appropriate reviewing authority on certain" offender complaints filed by inmates. Id. at ¶ 82. She reviewed the plaintiff's complaint, including the ICE's findings and recommendation, and dismissed the complaint on May 28, 2014. Id. at ¶ 83. Tiruveedula also directed the Industries Program Specialist to follow up with the Waupun Metal Furniture Shop to confirm that they were following all of the proper procedures. Id. at ¶ 86.

The plaintiff appealed the decision to the Corrections Complaint Examiner (CCE), and on May 30, 2014, the CCE recommended that the appeal be dismissed. Id. at ¶ 84. The CCE found that "the institution reasonably and

17

appropriately addressed the issue" and that the plaintiff "did not present further information on appeal to warrant overturning Tiruveedula's decision." Id. The Secretary accepted the CCE's recommendation on June 3, 2014. Id. at ¶ 85.

On June 2, 2014, the plaintiff "submitted an Interview/Information Request form to Security Director Meli, questioning why Body Shop workers were not allowed to shower." Id. at ¶ 87. He referred the request to Lt. Sabish, who on June 11, 2014 responded in writing that staff was looking into the issue. Id. at ¶¶ 87-88. By that time, the plaintiff no longer worked in the Body Shop, because he began working as a clerk in May 2014. Id. at ¶ 23.

"On June 25, 2014, Vande Slunt issued a memo to all metal furniture employees informing them that inmate painters and inmates who work with insulation would be allowed to rinse off" (with soap) "at the end of their shift in the single shower stall in the Metal Furniture building." Id. at ¶ 89. "Shortly after the memo was issued, the list of jobs allowed to shower at the end of their shift was expanded to include the body shop workers." Id. at ¶ 90.

The defendants contend that allowing an inmate to rinse in the shower at the end of a shift is a "courtesy to inmates who work with irritants." Id. at ¶ 91. They assert that a shower is not *required* at the end of the shift, because these inmates are not working with hazardous materials. Id. The inmates "have the opportunity to wear protective gear and clothing, such as overalls, gloves, masks, goggles, and hair nets, to reduce exposure to irritants." Id.

18

## II.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, **including depositions, documents, electronically stored** information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

19

## III.   DISCUSSION

The defendants argue that they are entitled to summary judgment because: (1) the plaintiff was not subjected to objectively dangerous conditions; (2) the named defendants were not personally responsible for the plaintiff's alleged constitutional deprivations; and (3) the defendants were not deliberately indifferent because they did not know of and disregard an excessive risk to the plaintiff's safety. The defendants also argue that they are entitled to qualified immunity.

In response, the plaintiff submits that the defendants failed to provide him with proper or adequate safety equipment while he was working with MCS, which was dangerous to his life or health.  The plaintiff also argues that the defendants failed to warn him or provide proper gloves before he worked with blade coolant, which affected his health and caused undue pain.  The plaintiff maintains that all of the defendants were personally responsible, including supervisors who learned of the plaintiff's rights and failed to take corrective action to fix the situation.

### A.   Eighth Amendment Standard

> The Eighth Amendment forbids knowingly compelling an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful. It forbids forcing prisoners to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain.

Smith v. Peters, 631 F.3d 418, 420 (7th Cir. 2011) (quotations and citations omitted). To prevail on a deliberate indifference claim, the plaintiff must produce evidence that satisfies two elements: (1) the danger to the inmate must

20

be objectively serious; and (2) the defendants must have acted with deliberate indifference. Hall v. Bennett, 379 F.3d 462, 464 (7th Cir. 2004) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

"A prison official's duty under the Eighth Amendment is not to provide complete safety; it is to ensure 'reasonably safety.'" Bagola v. Kindt, 131 F.3d 632, 646 (7th Cir. 1997) (quoting Farmer, 511 U.S. at 844). The Eighth Amendment requires prison officials to take "reasonable steps" to ensure "reasonable safety." Bagola, 131 F.3d at 647-48 (quoting Farmer, 511 U.S. at 844). "Such reasonable steps may insulate a prison official from liability, 'even if the harm ultimately was not averted.'" Id. at 648 (quotations omitted). In Bagola, the court discussed the prison officials' steps to ensure safety and determined that the plaintiff's injury resulted from negligence, not deliberate indifference. Id. at 646-48.

B.     Objectively Serious Danger

As an initial matter, the court notes that there are genuine disputes of material fact that preclude the court from determining whether the plaintiff faced objectively serious dangers at the Metal Furniture building.

According to the defendants, there is an abundance of safety equipment available to inmates in the Metal Furniture building, including waterproof gloves, leather gloves, rubber gloves, rubber-dipped cloth gloves, body coverings/disposable coveralls, caps, masks, and eye protection. Dkt. No. 38 at ¶ 31. In contrast, the plaintiff says he never was provided, or instructed to wear, a mask, Dkt. No. 22 at 3, and that there were no signs warning him to

21

wear a mask. The plaintiff also says that the protective gear and the ventilation system in the Body Shop is inadequate, and that there are no MSDS books or sheets available regarding the materials with which the inmates work.

Under the summary judgment standard, the existence of such genuine disputes of material fact would require the court to deny the defendants' summary judgment motion. Even if the court had sufficient undisputed facts to demonstrate that the plaintiff was subjected to objectively dangerous conditions in the Body Shop or in the basement of the Body Shop while working with blade coolant, however, the court could not grant summary judgment if there was no evidence that each of the named defendants was deliberately indifferent to such conditions and the risks at which they may have placed the plaintiff. So the court will move on to consider the plaintiff's claims against each named defendant.

C.    Plaintiff's Claims Against Each Defendant

The court allowed the plaintiff to proceed on two distinct claims. The first relates to the use of MCS in the Body Shop, and alleges that defendants Schrubbe, Cerney, Sabish, and Meli failed to provide or require proper safety equipment when the plaintiff was working with MCS, which is a carcinogen. The plaintiff says he was not warned that he was being exposed to a "known carcinogen" and that it caused him to cough and sneeze out black matter, causing chest pains, dizziness and nose bleeds." Dkt. No. 22: 3-4, ¶¶ 12, 14, 16.

Case 2:14-cv-00904-PP    Filed 03/30/16    Page 22 of 37    Document 60

The plaintiff's second claim alleges that defendants Vande Slunt and Tiruveedula failed to warn the plaintiff or provide safety equipment for working with a blade. Dkt. No. 12 at 3. He submits that he came into contact with a blade coolant product on March 4, 2014, and developed "a large rash and hives" on the back of his hand that "lasted over 10 days." Dkt. No. 22: 4, ¶ 17.[4]

The court must evaluate whether each defendant was personally involved in the alleged constitutional violations. A plaintiff may bring a §1983 claim only against those individuals who are personally responsible for a constitutional deprivation. See Doyle v. Camelot Care Cntrs., Inc., 305 F.3d 603, 614 (7th Cir. 2002) (citation omitted). This also means that, under §1983, a plaintiff may not rely on the doctrine of *respondeat superior* (supervisory liability) to hold supervisors liable for the misconduct of subordinates. Id. In order to be held liable under §1983, supervisors must have had some personal involvement in the constitutional deprivation, such as directing, or consenting to, the challenged conduct. Id. at 514-15 (citing Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001)).

---

[4] The plaintiff also suggests that Vande Slunt and Tiruveedula "would be well aware of the problems BSI has had in the past." Dkt. No. 45 at 5. Specifically, he asserts that BSI had been "taken to court by the [Department of Natural Resources] for dumping hazardous material onto the ground," and that there was a "problem with lead in the water." Id. He attempts, some six months after filing his complaint and four months after the defendants answered, to insert arguments that because there had been an allegation in the past that there was lead in the water, that problem must still exist, and would affect inmates who showered in the water or who washed off coolant or other irritants. The plaintiff did not make allegations regarding lead in either his original or his amended complaint, and provides no proof that such a problem existed at the time of the events he describes.

23

### 1. Schrubbe

The amended complaint alleges that Schrubbe failed to tell him to wear a respirator, or to provide him with one, despite knowing he was at risk, Dkt. No. 22 at 8, didn't allow body room workers to have showers, id., and that she failed to require him to wear proper gloves while working with blade coolant, id. at 10. He also alleged that Schrubbe violated his right to patient confidentiality by giving the complaint examiner information from his medical file. Id. at 9.

The evidence the plaintiff presents regarding defendant Schrubbe is that: (1) "HSU staff" does an annual or semi-annual walk-through "to check that inmate workers are provided proper work boots, safety glasses, and gloves;" (2) injured inmate workers are treated by HSU medical staff; and (3) Schrubbe "would be aware" of injuries from metal grindings and MCS and working with blade coolant without proper gloves. Dkt. No. 22: 4-5, ¶¶ 23-27. The plaintiff does not submit any evidence that it was Schrubbe's job to provide protective equipment, or that she denied him protective equipment. He presents no evidence that Schrubbe actually conducted a walk-through and saw the plaintiff working in the Body Shop without proper safety equipment. He acknowledges that she did not participate in his medical treatment on March 4, 2014 (the incident involving his contact with blade coolant), and does not allege that she was involved in any medical treatment regarding his alleged exposure to MCS.

The allegations in his amended complaint that Schrubbe "would be aware" of certain facts amounts to an argument that, in her capacity as the

HSU manager, she would have been in possession of certain information about safety issues. Schrubbe is not liable under §1983 simply based on her role as HSU Manager. T.E. v. Grindle, 599 F.3d 583, 588 (7th Cir. 2010); Palmer v. Marion County, 327 F.3d 594 (7th Cir. 2003) (Section 1983 does not allow actions against persons merely because of their supervisory roles.).

The plaintiff also says that he sent Schrubbe a copy of his ICE Addendum, which identified MCS as a carcinogen and suggested that a shower was necessary to wash it off after an inmate's shift. This argument suggests that he believes that once Schrubbe was notified of his views on how best to handle MCS exposure, she became liable to him. But "[p]ublic officials do not have a free-floating obligation to put things to rights . . . ." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). An argument that "everyone who knows about a prisoner's problem must pay damages implies that [the prisoner] could write letters to [1,000 public officials], demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right." Id.

In addition, it is the inmate complaint examiner's job—not a nurse's, or a security director's, or a sergeant's, or a BSI supervisor's job—to review and act on inmate complaints. Simply sending Schrubbe (and Meli, Cerney, and Vande Slunt) a copy of his ICE Addendum is not enough to subject them to liability. That addendum was sent as part of the offender complaint process, and the

25

defendants who received copies were justified in believing the claims in the addendum would be addressed in that process. Id.

Finally, the plaintiff's allegation that Schrubbe violated his right to confidentiality is just that—an allegation. There is no evidence in the record to support it.

Even if there were undisputed facts demonstrating that a constitutional violation occurred, the plaintiff has not provided any evidence that Schrubbe was personally involved in such violations. The court will grant Schrubbe's motion for summary judgment.

### 2.    Meli

The amended complaint alleges that Meli failed to provide him with a respirator or tell him to wear one (despite knowing that he was exposed to hazardous materials), not allowing him showers, and failing to provide him with proper gloves for working with the blade. Dkt. No. 22 at 8, 10.

As evidence, the plaintiff alleges that he sent Meli a copy of his ICE addendum in April 2014, and that he sent Meli an Interview/Information Request form on June 2, 2014 questioning why Body Shop workers were not allowed to shower after their shifts.

As the court noted above in its discussion of the plaintiff's claims against Schrubbe, the simple fact that he sent Meli a copy of the ICE Addendum does not trigger liability for Meli. See Burks, 555 F.3d at 595.

In the June 2014 request, the plaintiff explained that Body Shop workers work with MCS, a carcinogen, and asked why Body Shop workers were not

allowed to shower after their shifts. Meli read the request and forwarded it to Lt. Sabish to address. This shows that, rather than demonstrating deliberate indifference to the plaintiff's concerns, Meli took action. That action was sufficient to absolve Meli of liability. Also, by June 2014, the plaintiff was no longer working in the Body Shop (he became a clerk in May 2014), so even if there were undisputed facts showing that the plaintiff's work in the Body Shop violated his constitutional rights, the plaintiff would no longer have been subject to those violations by the time Meli received the request; there would be no violations of the plaintiff's rights that Meli could have addressed by that point.

Because simply notifying Meli of an alleged health risk was not enough to establish Meli's personal involvement or liability, and because he did take action when he was notified (rather than being deliberately indifferent), the court will grant Meli's motion for summary judgment.

### 3. *Sabish*

The amended complaint makes the same claims against Sabish as it made against Schrubbe and Meli. Similarly, the plaintiff's only claims of personal involvement by Sabish are that the plaintiff sent Sabish a copy of the ICE Addendum in April 2014, and that Meli referred the June 2014 request to Sabish to address.

Again, the simple fact that the plaintiff sent Sabish a copy of the ICE Addendum does not trigger liability for Sabish. See Burks, 555 F.3d at 595.

27

As to the June 2014 request, the court already has noted above that the plaintiff no longer worked in the Body Shop by the time Sabish would have received the request. If the plaintiff's exposure to MCS was a constitutional violation, it was no longer going on by the time Sabish received the request.

Nevertheless, Sabish wrote to the plaintiff on June 11, 2014, and told him that staff was looking into the issue. Dkt. No. 38 at ¶ 88. Then Vande Slunt issued a memo on June 25, 2014, informing metal furniture employees that some inmate workers would be allowed to rinse off (with soap) at the end of their shift in the single shower stall in the Metal Furniture building. Id. at ¶ 89. Shortly thereafter, the list of jobs allowed to shower at the end of their shift was expanded to include the Body Shop workers. Id. at ¶ 90. Like Meli, Sabish did not demonstrate deliberate indifference to the plaintiff's concerns; he took action, and that action resulted in a change in policy that allowed Body Shop workers to shower at the end of their shifts.

Because simply notifying Sabish of an alleged health risk was not enough to establish Sabish's personal involvement or liability, and because Sabish did take action when he was notified (rather than being deliberately indifferent), the court will grant Sabish's motion for summary judgment.

### 4. Cerney

The plaintiff's claims against Cerney are the same as those asserted against the previous three defendants.

The defendants asserted in their proposed findings of fact that the plaintiff never complained to Cerney about his concerns regarding lack of

28

proper safety equipment. Id. at ¶ 92. The plaintiff responded that that

assertion, stating, "Plaintiff did talk with his tech, Russ, and C.O. Lowney . . .

and voiced his concerns in his grievance which was sent to Vande Slunt, Meli

and Cerney by Tiruveedula." Dkt. No. 46 at 28. The plaintiff concedes, then,

that he did not complain to Cerney directly. As the court already has

discussed, sending Cerney a copy of his ICE Addendum in April 2014 did not

make Cerney liable. See Burks, 555 F.3d at 595.

     The plaintiff suggests that Cerney must have known that MCS was

present in the Body Shop and that employees working with MCS should wear a

mask or respirator. He further submits that Cerney must have noticed that the

plaintiff did not wear a mask or respirator while working with the MCS, and

argues that Cerney was deliberately indifferent when Cerney did not intervene

to tell the plaintiff to wear a mask or respirator.

     Cerney's role in the Body Shop was to oversee security, not workplace

safety. Dkt. No. 38 at 4. This fact matters. "A prison official acts with a

sufficiently culpable state of mind when he knows of a substantial risk of harm

to an inmate and either acts or fails to act in regard to that risk." Arnett v.

Webster, 658 F.3d 742, 751 (7th Cir. 2011) (citation omitted). "Deliberate

indifference 'is more than negligence and approaches intentional wrongdoing.'"

Id. (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998).

The plaintiff's argument assumes that a guard would know, among other

things, (a) that Body Shop workers worked with materials containing MCS, (b)

that MCS was a carcinogen, (c) that certain protective equipment and measures

could protect against exposure to that carcinogen, (d) that exposure to MCS at certain levels caused medical risk, and (e) that certain inmates knew, or did not know, what safety precautions to take. There is no evidence in the record to support any of these assumptions. There is nothing in anything the plaintiff has submitted indicating that Cerney knew all of these things and almost intentionally ignored them.

It is true that Cerney was involved in policy changes which, for a time, resulted in BSI workers not being allowed showers at the end of their shifts. Even assuming, as the plaintiff does, that a shower reduces the consequences of being exposed to MCS, there is nothing in the record to demonstrate that Cerney knew that some workers might have been exposed to carcinogens, or that he knew that a shower might reduce the consequences of that exposure. The record indicates that Cerney's efforts to reduce the showers for BSI workers were not related to medical or health issues in any way; he was seeking to avoid a situation in which non-BSI worker inmates would perceive unfairness that BSI workers got to shower more frequently than non-BSI workers.

Further, as noted, the plaintiff assumes that he was exposed to MCS, that he was sufficiently exposed to endanger his health, and that washing off would ameliorate or reduce that health risk. Even viewing the evidence in the light most favorable to the plaintiff and accepting all of those assumptions as fact, Body Shop inmates had the opportunity to wash. There were large, deep sinks with soap in both the Body Shop and the basement. Cerney's efforts to

30

reduce shower time for BSI workers did not deprive them of the opportunity to wash.

There is no evidence in the record before the court to demonstrate that Cerney was deliberately indifferent, even assuming that the plaintiff had been exposed to an objectively serious danger. The court will grant Cerney's motion for summary judgment.

5.    *Vande Slunt*

The amended complaint alleges that Vande Slunt failed to inform him, or to post information indicating, that he was being exposed to carcinogenic materials; failed to provide proper safety equipment; and failed to warn him that coolant could cause skin rash while failing to provide him proper gloves or safety equipment. Dkt. No. 22 at 8, 10.

The plaintiff never complained to Vande Slunt about a lack of safety equipment. Dkt. No. 38 at ¶ 56. There is no evidence in the record indicating that it was Vande Slunt's job to provide safety equipment such as masks or gloves. While there are issues of material fact regarding what safety equipment was available to the plaintiff, the record does not indicate that Vande Slunt was responsible for making that equipment available, or that he deprived the plaintiff of the equipment.

The plaintiff implies that Vande Slant failed to train him in the proper safety precautions. This claim is misplaced; the record demonstrates that Vande Slunt does not train Body Shop workers. They are trained by Techs.

31

Vande Slunt asserted that to his knowledge, the plaintiff was properly trained. Vande Slunt had no personal involvement in the plaintiff's safety training.

With regard to his exposure to the blade coolant, the plaintiff describes only one instance, in March 2014, in which he asserts that he developed a rash from contact with blade coolant. He submits no evidence to suggest that he ever had to work with the blade coolant again, or that he ever came into contact with the coolant again. He does not assert that Vande Slunt knew, before March 2014, that blade coolant could cause a rash. He does not assert that Vande Slunt refused to give him proper safety equipment, or that Vande Slunt even knew of any likelihood that the plaintiff would have skin contact with blade coolant.

The fact that the plaintiff sent Vande Slunt a copy of his April 17, 2014 ICE Addendum regarding the lack of showers is not enough to trigger Vande Slunt's personal liability regarding allegations of MCS exposure. See Burks, 555 F.3d at 595. The record does indicate that shortly after BSI workers' shower passes were canceled around March of 2014, Vande Slunt "had to seek permission" to allow "inmates with certain jobs to use the single shower stall in the Metal Furniture Building to rinse off after work." Dkt. No. 38 at ¶ 78. One can infer from the plaintiff's March and April, 2014 complaints that he did not have one of those certain jobs. There is no evidence in the record, however, to indicate that Vande Slunt excluded the plaintiff's job out of indifference to an objectively serious danger; the record contains no evidence at all regarding which jobs Vande Slunt included in his request, or how he made the

determination of which workers should be allowed to shower in the single stall. It was Vande Slunt who notified metal furniture employees at the end of June 2014 that they were now among those who could rinse off in the stall, id. at ¶ 89, and shortly thereafter, all Body Shop workers were allowed to shower at the end of their shifts, id. at ¶ 91. None of this sparse evidence indicates that Vande Slunt's actions were based on a deliberate indifference to an objectively serious danger.

When ICE Moon dismissed the plaintiff's offender complaint in May 2014, she indicated that she was going to send a copy of her decision to Vande Slunt "to make sure that inmate Stelter's current job is appropriate since he is breaking out from doing it and the shower process is not going to change." Dkt. No. 38 at ¶ 81. This is the only evidence in the record indicating that someone was going to ask Vande Slunt personally to assess and, if necessary, take action on the plaintiff's situation. The record does not indicate whether Moon actually did send Vande Slunt a copy of her recommendation. But the court notes that the dismissal recommendation is dated May 20, 2014, and that sometime in May 2014, the plaintiff switched from working in the Body Shop to a clerical job with BSI. The court does not know whether this switch occurred as a result of Moon's recommendation, or whether Vande Slunt had anything to do with the change in jobs. But very close to the time that Moon said she was going to ask Vande Slunt to assess the plaintiff's job, the plaintiff transferred to a different job, and was no longer at risk for being exposed to MCS or coming into contact with coolant. Even assuming that, as of May 20 or

33

so of 2014, Vande Slunt was asked to assess the plaintiff's situation, the risk that the plaintiff alleges Vande Slunt should have protected him from decreased to zero at about the same time.

The record is devoid of any evidence that even if the plaintiff was subject to an objectively serious danger, Vande Slunt was aware of that and was deliberately indifferent. The court will grant Vande Slunt's motion for summary judgment.

### 6. *Tiruveedula*

As Corrections Administrative Supervisor for BSI, Tiruveedula was responsible for general oversight of health and safety policies. Dkt. No. 38 at ¶ 11. She had no involvement in the day-to-day operation or supervision of the BSI shops; that responsibility belonged to the individual BSI shops or staff. Id. at ¶ 12. There is no evidence that policies or practices instituted by Tiruveedula exposed the plaintiff to an objectively serious danger.

In his amended complaint, the plaintiff alleged that Tiruveedula failed to inform him, or post information, that materials he was working with could cause lung damage or cancer, and failed to provide proper safety equipment. Dkt. No. 22 at 8. He also alleged that Tiruveedula failed to inform him, or post information telling him, that blade coolant could cause severe skin rash, and that she failed to provide proper gloves or safety equipment. Id. at 9.

The record shows that Tiruveedula was personally involved in the incidents the plaintiff describes in the following ways: (1) as the appropriate reviewing authority, on May 28, 2014, she reviewed and dismissed the

plaintiff's April 17, 2014 offender complaint (asking how he was being protected from carcinogens if he wasn't being allowed to shower); and (2) after the plaintiff submitted that complaint, she directed the Industries Program Specialist to follow up with the Waupun Metal Furniture Shop to confirm that they were following all of the proper procedures. Dkt. No. 28 at ¶ 82-83, 86.

With regard to her review and dismissal of his complaint, the plaintiff does not allege that Tiruveedula failed to do her job as reviewing authority; he simply disagrees with her decision. That disagreement does not establish deliberate indifference. As has been discussed, the fact that the plaintiff notified Tiruveedula that he believed he was being exposed to carcinogens, and that he believed that showering would ameliorate the impact of that exposure, did not make her personally liable.

As with Sabish, Tiruveedula's direction to have someone follow up regarding the compliance with proper procedures at Waupun shows the opposite of deliberate indifference. She took reasonable steps to ensure that the BSI shops at Waupun were reasonably safe. See Bagola, 131 F.3d at 647-48.

To the extent she was personally involved, the record contains no evidence that Tiruveedula was not deliberately indifferent to the plaintiff's safety.

   D.    Qualified Immunity

Because the court finds that all of the defendants are entitled to judgment as a matter of law, it will not discuss the defendants' argument that

they are entitled to qualified immunity.

## IV.  CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt.
No. 36. The court **ORDERS** that this case is **DISMISSED**. The court **ORDERS**
the clerk to enter judgment on behalf of the defendants.

This order and the judgment to follow are final. A dissatisfied party may
appeal this court's decision to the Court of Appeals for the Seventh Circuit by
filing in this court a notice of appeal within 30 days of the entry of judgment.
See Federal Rule of Appellate Procedure 3, 4. This court may extend this
deadline if a party timely requests an extension and shows good cause or
excusable neglect for not being able to meet the 30-day deadline. See Federal
Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or
amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief
from judgment under Federal Rule of Civil Procedure 60(b). Any motion under
Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry
of judgment. The court cannot extend this deadline. See Federal Rule of Civil
Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must
be filed within a reasonable time, generally no more than one year after the
entry of the judgment.  The court cannot extend this deadline. See Federal Rule
of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of March, 2016.

BY THE COURT:

_____

HON. PAMELA PEPPER
United States District Judge